IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TEMPLE OF 1001 BUDDHAS, et al.,

             Plaintiffs,

      v.

CITY OF FREMONT,

             Defendant.

Case No.  21-cv-04661-CRB

**ORDER GRANTING MOTION TO DISMISS**

Plaintiff Miaolan Lee lives on property owned by the Temple of 1001 Buddhas in Fremont, California.  For the past eight years, City of Fremont employees have had numerous interactions with Lee and the property, all pertaining to whether certain structures on the property comply with various California laws and regulations and municipal codes.  After numerous searches, inspections, orders, and negotiations, the City issued an amended Notice and Order to Abate Nuisance in March 2021.  The 58-page Notice and Order listed thirteen violations of the Fremont Municipal Code and California laws (including but not limited to the California Building Code, Electrical Code, and Plumbing Code), and set a deadline for Lee to submit plans to fix the problems, which would require demolishing certain structures.

Lee and the Temple sued the City, asserting various federal and California claims. The Court previously granted the City's motion to dismiss with leave to amend.  Lee and the Temple filed an amended complaint with nine claims.  The City now moves to dismiss again.  The Court GRANTS the motion to dismiss all claims.  The Court denies leave to amend Claims 2, 4, and 8, and grants leave to amend as to Claims 1, 3, 5, 6, 7, and 9.

United States District Court
Northern District of California

I.     BACKGROUND AND PROCEDURAL HISTORY

A.     Factual Background

This lawsuit concerns property located at 6800 Mill Creek Road in Fremont, California.  See FAC (dkt. 26) ¶ 14.  The property consists of 29 acres and is zoned as "open space" under the City's laws.  Id. ¶¶ 14, 21.  It is situated on a hillside where the slope of the land is 15% or higher, in a very high fire hazard area, and an earthquake-induced landslide zone.  See RJN, Ex I (dkt. 28-9), at 2.[1]

California's Williamson Act provides that any city may "by contract limit the use of agricultural land for the purpose of preserving such land pursuant and subject to the conditions set forth in the contract" and elsewhere in the Act.  Cal. Gov. Code § 51240.  Such a contract must exclude land "uses other than agricultural, and other than those compatible with agricultural uses, for the duration of the contract."  Id. § 51243.  After an initial ten-year term, the contract renews annually unless either party serves a notice of nonrenewal.  Id.  In 1978, pursuant to the Williamson Act, a predecessor-in-interest to the property signed a "Land Conservation Contract" with the City.  FAC ¶ 18.  The contract with the City stated:

> During the term of this contract, or any renewal thereof, the said property shall not be used for any purpose, other than agricultural uses for producing agricultural commodities for commercial purposes and compatible uses as listed below.

Id.  The contract then listed potential compatible uses, including "living quarters and home occupations," "public and quasi-public buildings," and "accessory use to the above."  Id.  The contract appears to still be in effect, as Lee does not allege that she (or the City) has ever served notice of nonrenewal.  Id. ¶ 19.

In 2010, Lee purchased the property.  Id. ¶ 15.  In the ensuing years, Lee initiated considerable additional construction on the property.  See id. ¶ 20.  She uses several of the

---

[1] The Court may consider the Final Notice and Order to Abate Nuisance and other relevant matters of public record discussed here because they are incorporated by reference in the complaint and are not subject to reasonable dispute.  See Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018).  For that reason, the Court grants the City's request for judicial notice (dkt. 28).

structures for religious purposes.  Id. ¶ 20.  In March 2018, Lee deeded ownership of the property to the Temple of 1001 Buddhas, but she has continued to live there.  Id. ¶ 16.[2]  It currently contains the following structures:

> 1) Main Buddha Hall (a one-story garage that existed when Lee acquired the property but that was turned into a three-story building) (id. ¶¶ 20(a), 52, 89);
>
> 2) Meditation Hall (a barn that existed when Lee acquired the property but that was turned into a two-story structure) (id. ¶¶ 20(b), 52, 88);
>
> 3) Hindu God House Structure (120-square-foot gazebo with pond) (id. ¶¶ 20(c), 86);
>
> 4) Tree House;
>
> 5) Retreat House (a new two-story dwelling built to house individuals attending religious retreats) (id. ¶¶ 20(e), 44, 52, 90);
>
> 6) Green House;
>
> 7) Horse run-in shed;
>
> 8) A vacant mobile home at the creek (a structure that existed when Lee acquired the property but that was later modified);
>
> 9) Main Residence (a structure that existed when Lee acquired the property); and
>
> 10) Solar panels.

Id. ¶ 20.  Although Lee does not always refer to the structures by consistent terminology, the main dispute in this case appears to concern the Main Buddha Hall, the Meditation Hall, and the Retreat House, each of which have undergone extensive construction since Lee purchased the property.  See, e.g., id. ¶¶ 44, 52.

Beginning in 2017, City employees began to have numerous interactions with Lee and the property.  In October 2017, City Code Enforcement Manager Leonard Powell sent

---

[2] The complaint does not clearly allege Lee's connection to the Temple, but indicates that Lee has continued to live on the property.  See FAC ¶ 16; see also Opp. (dkt. 31) at 1 (referring to the property as "Lee's property").  The City has not argued that Lee's legal interest in the property is relevant.  The Court refers to Lee and the Temple collectively as "Lee."

3

Lee an email requesting access to the property.  Id. ¶ 30.  The next day, Powell and other City employees "trespassed" on the property and took pictures.  Id. ¶¶ 31, 32.[3]

This upset Lee.  In January 2018, Lee met with Gary West, the City's Building Department Chief, and complained that City employees were discriminating against her and had trespassed on the property.  Id. ¶ 38.  West told Lee that he urgently needed to inspect the property.  Id. ¶ 39.  He then sought and obtained an inspection warrant from the Superior Court.[4]  Id. ¶ 40.  On February 9, 2019, City employees searched the entire property, including Lee's bedroom and "most closets and drawers in the residence."  Id. ¶ 41.  They "rummaged through everything," including food in the kitchen and Lee's make-up.  Id.  City employees then placed license plate recording cameras across the street from the property from February 28, 2018 to March 9, 2018.  Id. ¶ 42.

On March 28, 2018, Lee's attorney wrote to the City stating that Lee "remained ready to cooperate with any and all requests and inspections."  Id. ¶ 43.  The next day, the City issued a "Notice and Order to Abate Nuisance" listing numerous alleged violations of the Fremont Municipal Code (FMC) and stating that no one could occupy three structures on the property (the Main Buddha Hall, the Meditation Hall, and the Retreat House).  Id. ¶ 44.  In particular, the City noted that the three buildings were:

> (1) "erected and/or altered in violation of [FMC] Title 15,"

---

[3] The employees reached the front gate of the property.  When the property's maintenance worker approached the gate to "see what they wanted," the gate automatically opened.  FAC ¶ 31.  The City employees drove inside and ignored the maintenance worker.  Id.  In December 2017, a California Department of Fish and Game warden accessed the property without permission.  Id. ¶ 34.  According to Lee, he "roamed the property . . . and then left a business card at the residence."  Id.  But Lee is suing only the City here.  Lee also alleges that during a City Hall meeting with Powell, Powell told her that she "looked prettier without a hat."  Id. ¶ 36.  Lee complained about Powell's behavior and objected to Powell's use of the letters "JD" on his City-issued business cards because Powell is not a lawyer.  See id. ¶ 38.  It appears that Powell did attend law school.  See RJN Ex. D at 21.  Again, Lee has not asserted any claim based on these allegations.

[4] According to the warrant, which is attached to the City's request for judicial notice, a City employee received various complaints in October of 2017 asserting that Lee was engaging in illegal construction, unlawful operation of multiple registered businesses, and possibly human trafficking.  See RJN (dkt. 28-4) at 40–56.  These complainant was able to view the construction from "his neighboring property, and, at least in part, led to various City and Police investigation.  Id. at 14.  Although Lee mentions the warrant in her complaint, she does not discuss the basis of the warrant, and the parties do not discuss it in their briefing.

United States District Court
Northern District of California

(2) "located in [a] very high fire hazard severity zone without adequate fire-resistance-rated construction and fire protection systems,"

(3) "lack[ing] adequate light, ventilation, illumination, insulation, sanitary facilities, and other essential equipment,"

(4) "on hillsides in earthquake induced landslide zones without appropriate mitigation measures,"

(5) "constructed without adequate structural and foundation systems," creating a "substantial risk of partial or complete collapse in [the] event of earthquake and earthquake induced landslides,"

(6) "constructed without plans or permits and the City [was] unable to determine the electrical connections and service for each," and

(7) lacking in "proper on site waste disposal and waste water treatment" so as to "pose contamination risk to adjoining streams, springs, and groundwater."

RJN Ex. I (dkt. 28-9). After Lee appealed the Notice and Order, the City Attorney told her that the Notice and Order would remain in effect based on the Land Conservation Contract. FAC ¶ 46.

In May 2018, Lee met with City staff "to attempt to resolve all concerns stated by the City." Id. ¶ 47. She agreed to allow City employees to inspect the property several days later. But Tanu Jagtap, a City Code Enforcement Officer, cancelled the appointment and instead sought and obtained an inspection warrant from the Superior Court. Id. The Officer's warrant application stated that Lee had not consented to City employees entering the property. Id. City employees executed the warrant and inspected the property again. Id. ¶¶ 48–49. On June 8, at the City's request, Jagtap conducted a fourth inspection of Lee's property with her own engineers and consultants present. Id. ¶ 50.

The City took additional action based on this inspection. In June 2018, Lee emailed a letter to Fremont's Mayor and City Council discussing her situation. FAC ¶ 51. West sent Lee a Notice and Order to Vacate the Main Buddha Hall, the Meditation Hall, and the

United States District Court
Northern District of California

Retreat House.  Id. ¶ 52.  This Notice and Order stated that the buildings were "unlawful, unsafe[,] and unfit for human occupancy," and was signed by West.  Id.  It required Lee to remove "all personal property" from them within two weeks.  Id.  Lee refused to remove Buddha statues from one structure.  Id. ¶ 54.  According to Lee, West informed her that she could pray in a dome meditation hall on the property and in the main house, but nowhere else.  Id. ¶ 55.  Later that month, City employees "requested and obtained entry" to the property, then posted notices barring entry on the "condemned buildings" and at the main entrance.  Id.  ¶ 56.

Lee responded to the June 2018 Notice and Order in various ways.  For example, she sent the City notices of appeal, retained various structural engineers and consultants to perform work on the buildings, and updated the City as she attempted to bring the buildings into compliance with the City's instructions.  Id. ¶¶ 58, 61.  City employees had several meetings with Lee's consultants and representatives regarding plans for the property and permit applications.  Id. ¶¶ 64–65.

But these steps did not lead to a mutually agreeable resolution.  In May 2019, the City recorded a Notice of Substandard Building/Structure with the County Recorder's Office of the County of Alameda, indicating that several buildings on Lee's property were "unsafe, dangerous and a public nuisance."  Id. ¶ 66.  The next month, Lee sent City Councilmember Raj Salwan a letter "complaining about discriminatory code enforcement" and the "inspection warrants."  Id. ¶ 67.  According to Lee, the Chief City Attorney told Salwan that the City was "ready for a lawsuit" because of Lee's opposition to the religious and racial discrimination she was experiencing.  Id.[5]  Lee alleges that despite her efforts, the City had decided to not engage in a "collaborative process."  Id. ¶ 69.  Lee applied for permits on October 7, 2019.  Id. ¶ 73.[6]

_____

[5] In September 2019, the City issued citations to Lee and her bookkeeper.  FAC ¶ 68.  Lee was unable to determine why she was cited, but in March 2020, the City withdrew the citations.  Id. ¶¶ 73, 77.

[6] Lee paid the City $27,250 in application fees to get conditional use permits.  FAC ¶ 70.  Lee alleges that the "regular price is $7,250," but the City planner insisted that Lee pay an additional $20,000 fee "for design review," even though the City does not "ordinarily . . . charge such fees at

Shortly thereafter, City employees made inartful statements suggesting that Lee was using religious rhetoric to obscure the problems with the property.  In December 2019, Lee met with Wayne Morris, the City's Deputy Community Director, and Powell.  Id. ¶ 74. Morris and Powell "insisted that Ms. Lee was using religion as a protective shield."  Id. According to Lee, Morris asked whether Lee thought "Buddha is ok with this construction."  Id.  Lee alleges that Morris laughed while asking whether she thought that "Buddha is ok with what you are doing?"  Id.  Morris then told Lee that the permit process was "going to be so expensive" that Lee would "give up and demolish."  Id.  Morris expressed that the buildings "need to come out."  Id.

In January 2020, Morris, Powell, and James Willis (another city employee) inspected the property again.  Id. ¶ 75.  Two days later, Lee told Willis that her neighbor, a white man, had performed unpermitted work on his property.  Id. ¶ 76.  The unpermitted work included "a garage 75 feet from the Creek, an elevated deck, a cottage and olive orchard."  Id.  When Lee first met her neighbor, the neighbor told her that he had completed various construction projects without the City's approval and used herbicide extensively on his property.  See id. ¶¶ 25–27.  Lee alleges that her neighbor received seven separate complaints in response to these activities.  Id. ¶ 28.  But according to Lee, "the City has never done anything" about her neighbor's violations, besides sending the neighbor a letter stating that he could apply for permits "to legalize" his past "unpermitted construction."  Id. ¶¶ 27, 76, 80, 86, 97.  In April 2020, Lee witnessed her neighbor looking at her property with binoculars.  Id. ¶ 78.

In October 2020, Lee submitted a modified application for permits and requested responses for their suggested "mitigating measures," but the City "ignored the request." Id. ¶ 79.  Willis told Lee the application was incomplete.  Id. ¶ 80.[7]

---

the outset of the process."  Id.  The City cashed Lee's check, but Lee never understood how the money was spent.  Id.

[7] In December 2020, Jagtap emailed Lee that the City had not received a progress update and timeline regarding the removal and reconstruction of unlawful structures.  See FAC ¶ 81.  Lee alleges that she had provided such updates, and she responded to the email by requesting a

On March 11, 2021, the City issued an Amended Notice and Order to Abate Nuisance.  Id. ¶ 85.  The 58-page document required the demolition of three buildings on the property.  Id.[8]  The Amended Notice and Order extensively documented thirteen violations of the City's zoning laws and permitting rules, as well as of California's Building Code, Electrical Code, Plumbing Code, Mechanical Code, Fire Code, Fish and Game Code, and Environmental Quality Act.  See, e.g., RJN Ex. I at 7, 10–11, 13–14, 17, 23–24, 26–27, 32–33, 38, 46–50, 52.  Lee was "shocked" because she had reported the additional structures to the County Assessor's Office in 2018 and paid the relevant taxes associated with them.  FAC ¶ 85.  According to Lee, some parts of the Notice failed to address how the structures at issue violated the FMC.  See generally id. ¶¶ 86–90.  After several attempts to discuss her situation with Fremont's Mayor and members of the City Council, Lee held a press conference denouncing the "systemic religious and race discrimination she was facing from [the] City" on May 11, 2021.  Id. ¶ 97.

### B.    Procedural History

In January 2018, Lee submitted a claim for damages to the City and the California Department of Fish and Game.  See RJN Ex. J (dkt. 12-10).  The claim stated that on October 27, 2017, City employees entered the property without consent or a warrant.  Id. It described that day's inspection and asserted various causes of action.  See id.  The same month, the City sent Lee a notice rejecting the claim.  See RJN Ex. K (dkt. 12-11).

In April 2021, Lee submitted another claim for damages based on events involving her property from October 2017 to April 2021.  See RJN Ex. L (dkt. 12-12).  As relevant here, the claim form reads:

> What happened and why do you believe the City is responsible?  Race, religion,

---

response regarding her proposed mitigation measures.  Id. ¶ 82.  She also raised numerous complaints regarding the inspection warrants that had been executed on the property.  See id.  The City employee did not respond.  Id. ¶ 83.

[8] According to Lee, Salwan told her to give the City employees "some money" to make her problems with the City "go away."  FAC ¶ 91.  Lee alleges that, on April 2, 2021, the FBI contacted her about Salwan's comments.  Id.

> gender discrim.  Fraud, trespass, 4 amend violation of Constitution, whistleblowing
> to FBI on gov corruption, intentional inflection of emo distress.
>
> Description of damage or loss: Civil rights, emotional distress, invasion of privacy,
> abuse of power, unconstitutional invasions.  Fraud, tress.  $ amount is up to the jury
> to decide.

Id.  The form did not contain additional details but provided Lee's attorney's contact

information "for any questions."  Id.  In May 2021, the City sent Lee a notice of

insufficiency indicating that Lee's claim lacked necessary detail.  See RJN Ex. M (dkt. 12-

13).  The City directed Lee to provisions of the California Government Code regarding the

presentation of claims against public entities.  See id.

Later in May 2021, Lee submitted an amended claim.  See RJN Ex. N (dkt. 12-14).

The amended claim again stated that the relevant injury occurred from "October 2017 to

the present."  Id.  The amended claim form reads:

> What happened and why do you believe the City is responsible?  The City of
> Fremont has interfered with and/or prevented the practice of my religion by Code
> Enforcement, Planning & Building Depts. Precluded my association with others of
> my faith, Invasion of privacy.  Religious & National Origin Discrim.
>
> Description of damage or loss: Loss of use of real property and structures on real
> property.  Damage to reputation.  Emotional Distress.

Id.  The City issued another notice stating that Lee's amended claim was insufficient "even

when read together with the initial claim."  RJN Ex. O (dkt. 12-15).  The City gave Lee 15

days to submit yet another amended claim.  Id.  After Lee failed to do so, the City rejected

Lee's claim.  See RJN Ex. P (dkt. 12-16).  Lee's final appeal of the City's enforcement

action was rendered on August 26, 2021.  RJN Ex. K.

In June 2021, the Temple and Lee filed the instant lawsuit, asserting a dozen federal

and state causes of action.  See Compl. (dkt. 1).  The Temple and Lee asserted two 42

U.S.C. § 1983 claims based on religious discrimination and retaliation, five claims under

the Religious Land Use and Institutionalized Persons Act (RLUIPA), and one claim under

the California Constitution's Free Exercise Clause.  Id. ¶¶ 82–90, 99–107, 132–88.  Lee

individually asserted additional § 1983 claims for discrimination based on race,

discrimination based on national origin, and unreasonable searches, along with two California claims for invasion of privacy and arbitrary discrimination.  Id. ¶¶ 91–98, 108–31.  The City moved to dismiss.  See Mot. (dkt. 11).  The Court granted that motion with leave to amend.  See Order (dkt. 25).

The Temple and Lee filed an amended complaint asserting nine federal and state causes of action.  See FAC.  The Temple and Lee assert two 42 U.S.C. § 1983 claims based on religious discrimination and retaliation, three claims under RLUIPA, one claim concerning the validity of the land conservation contract under California's Williamson Act, and one claim under the California Constitution's Free Exercise Clause.  Id. ¶¶ 99–108, 117–25, 133–65, 166–71, 172–80.  Lee individually asserts additional § 1983 claims for discrimination based on race, discrimination based on national origin, and unreasonable searches.  Id. ¶¶ 109–16, 126–32.   The City now moves to dismiss.  See Mot. (dkt. 27); see also Opp'n (dkt. 31).

## II.     GENERAL LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim for which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either a "cognizable legal theory" or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.  When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).

The Court "must consider the complaint in its entirety, as well as other sources

1   courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

2   documents incorporated into the complaint by reference, and matters of which a court may

3   take judicial notice." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322

4   (2007).

5           If a court dismisses a complaint for failure to state a claim, it should "freely give

6   leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  A court has

7   discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the

8   part of the movant, repeated failure to cure deficiencies by amendment previously allowed,

9   undue prejudice to the opposing party by virtue of allowance of the amendment, [and]

10  futility of amendment." <u>Leadsinger, Inc. v. BMG Music Pub.</u>, 512 F.3d 522, 532 (9th Cir.

11  2008).

## III.    DISCUSSION

13          The Court grants the City's motion to dismiss.  Lee's § 1983 claims fail because

14  Lee is suing only the City and has not set forth allegations that establish the elements of

15  municipal liability under § 1983.  Lee's RLUIPA claims fail because she is not injured by

16  the relevant land use provision and/or any injury is not redressable because the injury is

17  independently caused by the other state and city law violations.  Finally, Lee's California

18  claims fail because Lee is not injured by the land conservation contract and she once again

19  misunderstands the relevant land use provision.  The Court gives leave to amend only

20  Claims 1, 3, 5, 6, 7, and 9.

### A.      Section 1983 Claims (Claims 1-4)

22          Lee raises four claims under 42 U.S.C. § 1983.  These claims assert that Lee has

23  suffered violation of their right to free exercise, racial and national origin discrimination,

24  retaliation for Lee's opposition to discrimination, and unconstitutional searches.  FAC

25  ¶¶ 99–132.  As in Lee's prior complaint, these claims fail because Lee has not alleged any

26  constitutional harm caused by a municipal policy or final policymaker, as required under

27  <u>Monell v. Dept. of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978).

28          Under 42 U.S.C. § 1983, any person who, "under color of" state law, subjects any

United States District Court
Northern District of California

11

person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." "[M]unicipalities and other local government units" are "included among those persons to whom § 1983 applies." Monell, 436 U.S. at 690.  That said, "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Id. at 691.  That means "a municipality cannot be held liable solely because it employs a tortfeasor . . . on a respondeat superior theory." Id. (emphasis in original).

Section 1983 embraces a cause of action against a municipality only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or implements or executes a less formal "governmental custom." Id. at 690–91 (quotation omitted); see also Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc) ("In order to establish municipal liability, a plaintiff must show that a policy or custom led to the plaintiff's injury.") (quotation omitted).  That does not mean the relevant policy or custom itself must be unconstitutional. See City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989).  But there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Id. at 385.  And the policy or custom must be "the moving force behind the constitutional violation." Id. at 388 (alteration and quotation omitted).

Three situations satisfy the Monell policy requirement: "when the plaintiff was injured pursuant to [1] an expressly adopted official policy, [2] a long-standing practice or custom, or [3] the decision of a final policymaker." Ellins v. City of Sierra Madre, 710 F.3d 1049, 1066 (9th Cir. 2013) (quotations omitted).

### 1.    Official Policy or Custom

Lee fails to allege that any of the alleged constitutional injury in her four claims arise from either an "expressly adopted policy" or a "long-standing practice or custom." See Ellins, 710 F.3d at 1066.  In its prior order, the Court explained:

12

> Based on the broader complaint, the only policy or custom relevant to this cause of action is FMC section 18.55.110. Elsewhere, Lee asserts that section 18.55.110 precludes "any form of religious use" of land in the City's open space district. As discussed above, that is not true. And this cause of action does not even mention FMC section 18.55.110. . . Instead, it appears to rest on City employees' individual enforcement decisions and actions.

Order at 20 (cleaned up).  This analysis remains apt.

Lee continues to be incorrect in her conclusory allegation that the City "by its zoning ordinance has deprived Plaintiffs of the usage of the real property for religious purposes."  FAC ¶ 103.  Nothing in the zoning ordinance prevents Lee from using real property for religious purposes.  FMC § 18.55.110 does not permit "quasi-public" purposes in the "Hill (beyond ridgeline)" area.  Id. ¶ 174–75.  But Lee repeatedly states that "the exercise of [these free exercise] rights, in this specific context, would be private."  Opp'n. at 25.  The zoning provision freely permits private religious use on her property.  See FMC § 18.25.3080.

And Lee fails to suggest that any of the isolated acts by City employees manifest a policy or custom.  For example, she never suggests that the City has an official policy or custom of confining residents' praying to certain buildings on their properties or of making derogatory remarks about Buddhism.  Cf. FAC ¶¶ 55, 74.  And despite Lee's allegation that her neighbor was treated differently, there is no allegation that he is similarly situated and no prior, similar incidents of discriminatory enforcement.  See Navarro v. Block, 72 F.3d 712, 714–15 (9th Cir. 1996) (holding that allegations of single instances of misconduct are insufficient to establish municipal custom).  Lee therefore has not pleaded any of her four claims on either of these two Monell theories.

### 2.   Final Policymaker

Lee has also failed to plead that any of her four claims—violation of free exercise, racial and national origin discrimination, retaliation, or unlawful searches—resulted from the decision of a "final policymaker."  See Ellins, 710 F.3d at 1066.  Lee's main argument is that Gary West was a final policymaker for the City.  Even to the extent she is correct, Lee fails to plead that West's policy decisions caused any plausible constitutional injury.

United States District Court
Northern District of California

For <u>Monell</u> liability to attach, the individual committing the constitutional tort must have "final policymaking authority" under state law.  <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 124 (1988) (plurality opinion).  The key question is whether the individual has authority "in a particular area, or on a particular issue."  <u>McMillian v. Monroe County</u>, 520 U.S. 781, 785 (1997); <u>see</u> <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986) (noting that a policy may be a "course of action tailored to a particular situation and not intended to control decisions in later situations").  In short, a person must be in a position of authority such that his final decision on that issue may "appropriately be attributed to" the city.  <u>Lytle v. Carl</u>, 382 F.3d 978, 983 (9th Cir. 2004).

The final policymaker must either commit the constitutional tort or he must ratify "a subordinate's unconstitutional decision or action and the basis for it."  <u>Rodriguez v. Cty. of Los Angeles</u>, 891 F.3d 776, 802–03 (9th Cir. 2018) (quoting <u>Gravelet-Blondin v. Shelton</u>, 728 F.3d 1086, 1097 (9th Cir. 2013)).  Ratification requires a "deliberate choice to endorse" a subordinate's action.  <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1347 (9th Cir. 1992), <u>overruled on other grounds</u> (quoting <u>Pembaur</u>, 475 U.S. at 483).

Lee argues that West, as the City's building official, is a final policymaker with respect to the alleged injury.  <u>See</u> FAC ¶¶ 11, 12; Opp'n at 9–13.  Under California law, a "building official" is "invested with the responsibility for overseeing local code enforcement activities, including administration of the building department, interpretation of code requirements, and direction of the code adoption process."  Cal. Health & Safety Code § 18949.27.  The California Building Code states that the building official is "authorized and directed to enforce the provisions of this code" and "to render interpretations of this code and to adopt policies and procedures in order to clarify the application of its provisions."  CBC § 104.1.  It goes on to state: "Such interpretations, policies and procedures shall be in compliance with the intent and purpose of this code.  Such policies and procedures shall not have the effect of waiving requirements specifically provided for in this code."  <u>Id.</u>

To the extent that West may "adopt policies and procedures" to apply and enforce

the City's building code, Lee plausibly suggests that he has "final policymaking authority" on some "particular issues." See McMillian, 520 U.S. at 785.  In an unpublished decision, another court so concluded when considering Section 1983 claims against another city's building official who abruptly closed a motel and evicted its tenants.  See Herrera v. City of Palmdale, 2020 WL 7380144, at *8 (C.D. Cal. Oct. 8, 2020) (building official was plausibly a final policymaker where the municipal code "delegate[d] final policymaking authority to the Building Official to interpret, adopt, enforce, and create building code regulations, to investigate such violations, and to shut down buildings in violation of code violations").  Nonetheless, Lee's claims fail because she points to nothing within the scope of West's policymaking authority that caused any plausible constitutional harm.

### a.      Free Exercise and Racial Discrimination (Claims 1 and 2)

Lee's first two § 1983 claims allege that the City violated her right to free exercise of her religion and discriminated against her because of her race or national origin.  A state actor violates the Free Exercise Clause of the First Amendment when it "substantially burdens the person's practice of their religion."  Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir. 2015).  This standard requires "more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs."  Id. (cleaned up).  A government violates the Equal Protection Clause of the Fourteenth Amendment when it "act[s] with an intent or purpose to discriminate against the plaintiff based on" race or national origin.  Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001) (quotation and citation omitted).

Recall Lee's main allegations as to West.  In early 2018, Lee complained to West about her experiences with Powell, another City employee.  FAC ¶ 38.  After City employees further investigated the property, West issued and signed a Notice and Order to Vacate the Main Buddha Hall, the Meditation Hall, and the Retreat House for various violations of state and city law.  FAC ¶ 52; see RJN ¶ 8, Ex. H.  West allegedly told Lee that she "was not allowed to pray anywhere else on the real property" other than the

1    "'dome' meditation hall." FAC ¶ 55. West allegedly instructed her to remove all Buddha

2    statutes from the Main Buddha Hall and the Retreat House. Id. City officials then posted

3    notices barring entry to the three condemned buildings. Id. ¶ 56. The City later recorded a

4    "Notice of Substandard Building/Structure" stating that the three buildings were "unsafe,

5    dangerous and a public nuisance." Id. ¶ 66. Finally, she alleges that her neighbor, who is

6    a white man, completed unpermitted work including "a garage 75 feet from the Creek, an

7    elevated deck, a cottage and olive orchard" but has not faced as much enforcement from

8    the City. Id. ¶¶ 76, 113.

9         None of these allegations plausibly suggest that West, as a final policymaker,

10   "substantially burdened" Lee's right to practice her Buddhist religion (Claim 1). See

11   Rodriguez, 891 F.3d at 802–03. West used his enforcement discretion to investigate the

12   violations on the property and to issue a Notice and Order to Vacate. Judicially noticeable

13   facts show a strong factual basis to the conclusion that the property is in extreme

14   noncompliance with the law. See, e.g., RJN, Ex F, G, H, I, J. The property is on a hillside

15   with a slope of 15% or higher, in a very high fire hazard area, and an earthquake-induced

16   landslide zone. See RJN, Ex I, at 2. Although the code enforcement does not permit her to

17   use (for any purpose) the three buildings that are in severe noncompliance, Lee can

18   exercise her religion elsewhere on her property. The code enforcement does not at all

19   "coerce [her] into acting contrary to [her] religious beliefs or exert substantial pressure on

20   [her] to modify his behavior and to violate [her] beliefs." Jones, 791 F.3d at 1031.

21        Nor do the allegations plausibly suggest that West, as a final policymaker,

22   discriminated on the basis of her national origin or racial identity as an Asian-American

23   (Claim 2). Lee pleads no plausible facts to permit the inference that West had any intent to

24   discriminate against Asian-Americans (or against Buddhists). Lee does not allege that

25   West ever made a comment about Lee's race or national origin. Lee also does not clearly

26   allege that West made the decision to subject her neighbor, a white man, to less

27   enforcement under the city's building code. But even assuming West made this decision,

28   Lee has not alleged that her neighbor is similarly situated because she has not alleged that

United States District Court
Northern District of California

United States District Court
Northern District of California

his legal violations are as serious as those on the Temple's property.  FAC ¶¶ 26–28.  And even if she had, a conclusory allegation of disparate treatment of two people is insufficient to suggest "intent or purpose to discriminate" on the basis of race, national origin, or religion.  See Lee, 250 F.3d at 686.

The sole alleged statement that even conceivably suggests animus against religion is West's remark that Lee was not allowed to pray "anywhere else on the real property."  FAC ¶ 55.  Yet this comment does not suggest animus toward either Buddhists or Asian-Americans.  In any event, it was not made under West's final policymaking authority, as such a statement is not supported by the building code or any of the City's official acts, such as its Notices and Orders to Abate or the Notice and Order to Vacate.  While this remark was imprecise or perhaps insensitive, Lee has not plausibly pleaded that it can be "appropriately be attributed" to the City.  See Lytle, 382 F.3d at 983.[9]

Lee also alleges that other City officials made religiously-charged comments, but they are irrelevant to Claims 1 or 2 because she never alleges that West ratified them.  Rodriguez, 891 F.3d at 802–03.  For example, Lee never suggests that West ratified Morris and Powell's insensitive remark that Lee was "hiding behind the Buddha."  See id. ¶ 74 (alleging that Morris laughed and said, "Do you think Buddha is ok with what your [sic] are doing?").  In the absence of plausible allegations that West made a "deliberate choice to endorse" these statements or any underlying animus, they cannot support a Monell claim.  See Gillette, 979 F.2d at 1347.

### b.     Retaliation (Claim 3)

Lee's third § 1983 claim, which alleges that the City retaliated against her for her opposition to racial and religious discrimination, also fails.  See FAC ¶ 121.  A First Amendment claim for retaliation requires a "substantial causal relationship" between a plaintiff's "constitutionally protected activity" and "adverse [government] action . . . that

---

[9] West also relayed an instruction to remove the Buddhas from the buildings, FAC ¶ 55, but this comment does not plausibly suggest animus, as it is only logical to recommend removal of her property from buildings that are unsafe to be used for any purpose and must be demolished.

would chill a person of ordinary firmness from continuing to engage in the protected activity."  Blair v. Bethel Sch. Dist., 608 F.3d 540, 543 (9th Cir. 2010).

Lee fails to plead that West took "adverse action" with a sufficiently "substantial causal relationship" to the protected activity.  See id.  Although her complaint provides a long list of allegedly retaliatory actions, in her brief, Lee only argues two instances of retaliation: (1) West's seeking of a warrant after Plaintiff complained about alleged discrimination by Powell; and (2) West's issuing of a Notice and Order to Vacate three buildings the day after Lee's lawyers wrote a letter to the City emphasizing the religious significance of the buildings.  See Opp'n at 15-17.  But judicially noticeable facts contradict Lee's allegation that West was involved in the first instance of retaliation. Contrary to Lee's claim that West "sought and obtained an inspection warrant," FAC ¶ 40, the city attorney made the warrant application and West did not sign it or submit a declaration in support.  See RJN ¶ 4, Ex. D.  Moreover, it is implausible that securing the warrant was retaliatory because the facts in Lee's complaint and in the warrant itself suggesting that the warrant had ample basis by that point.  See id.

And although West signed the later Notice and Order to Vacate, Lee does not allege that he knew about Lee's letter to the City, and even if he did, Lee has not alleged a "substantial causal relationship" with that activity.  The Court cannot infer a "substantial causal relationship" merely because protected activity occurred and an enforcement action followed.[10]  That is particularly true in light of the voluminous evidence that the enforcement action was already ongoing because the property was in apparent noncompliance with a bevy of city and state laws.  See RJN, Ex F (prior Notice and Order to Abate Nuisance).  Without significantly more to connect West's enforcement action to Lee's protected activity, Lee does not plausibly allege that he engaged in any retaliation in

---

[10] Although temporal proximity may indicate causation, the cases Lee cites arise in the very different employment context, and none have similar facts to those here.  See Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 507 (9th Cir. 2000); Miller v. Fairchild Indus., Inc., 797 F.2d 727, 731 (9th Cir. 1986).  Her third case does not even discuss causation at all.  Soranno's Gasco v. Morgan, 874 F.2d 1310, 1316 (9th Cir. 1989).

United States District Court
Northern District of California

1   his capacity as final policymaker.

2   **c.      Unreasonable Searches (Claim 4)**

3   Lee's fourth § 1983 claim is that West, in his policymaking authority, engaged in

4   unconstitutional searches (Claim 4).  Lee alleges that the City engaged in trespass; falsified

5   information in order to obtain inspection warrants; sought inspection warrants without

6   prior notice to plaintiff; exceeded the scope of the warrants; installed cameras outside the

7   gates of the Subject Property; utilized neighborhood informants; and engaged in overhead

8   surveillance of the property.  FAC ¶ 129.  This claim fails both because the statute of

9   limitation has passed and because it is insufficiently pleaded.

10   First, this claim must be dismissed because it is untimely.  The statute of limitations

11   for section 1983 actions is that of personal injury actions in the forum state.  Maldonado v.

12   Harris, 370 F.3d 945, 954 (9th Cir. 2004).  In California, there is a two-year statute of

13   limitations for such actions.  Cal. Code of Civ. Proc. § 335.1; Maldonado, 370 F.3d at 954.

14   The events Lee complains of all occurred before the summer of 2018: the City entered

15   Lee's property with warrants on February 9, 2018 and May 24, 2018 and placed cameras

16   outside the property from February 28, 2018 through March 9, 2018.  The complaint was

17   filed on June 17, 2021, well over two years after these actions.

18   Even if the claim were timely, it would still fail.  Many of the underlying actions do

19   not even violate the Fourth Amendment, and the others are insufficiently pleaded.

20   Moreover, none resulted from West's policy decisions as building official or were

21   subsequently ratified by him in that capacity.  See Rodriguez, 891 F.3d at 802–03.

22   As noted in the Court's prior order, there is nothing unlawful about using

23   informants, placing a camera outside a property to record who comes and goes, or securing

24   a warrant without notice to the property owner.  Order at 22.  Lee still fails to concretely

25   allege any overhead surveillance.  See id.  To the extent that Lee attacks the warrants, Lee

26   does not sufficiently plead that they were materially false or that West was involved.  FAC

27   ¶¶ 40, 48.  She alleges that, "[a]t the direction of West, the City falsely represented to the

28   Court that Ms. Lee did not consent" to the search.  Id. ¶ 40.  Lee's vague allegation of

19

falsehood is implausible.  And, as noted above, West was not involved in the City's securing of the first warrant application, see RJN ¶ 4, Ex. D, or its second, see FAC ¶ 47; RJN ¶ 7, Ex. G.

Finally, Lee's allegation that City officials exceeded the scope of the February 8, 2018 warrant—including opening closets and inspecting "her food in the kitchen" and her "makeup drawer," FAC ¶ 41—also fails.  First, based on judicially noticeable facts, it is unclear whether any City official actually exceeded the scope of the warrant.  See RJN ¶ 4, Exh. D at 78 (allowing "for inspection of the interior and exterior of the main house" to determine compliance with various state and municipal codes).  Second, any theoretical violations are not sufficiently connected to West's policymaking authority.  While Lee alleges that West was present during the search, Lee does not plausibly attribute his actions to his "final policymaking authority" under state law.  See Praprotnik, 485 U.S. at 124.

In sum, although West may be a final policymaker under Monell with respect to enforcement and interpretation of the building code, Lee has failed to plead that he violated Lee's free exercise rights, discriminated on the basis of race or national origin, retaliated for protected activity, or committed an illegal search.  See Rodriguez, 891 F.3d at 802–03.  Nor has West pleaded that he ratified a constitutional injury perpetrated by one of his subordinates.[11]

_____

[11] Lee also asserts that Tanu Jagtap, as a City Code Enforcement Officer, was a final policymaker because Bronwen Lacey, a Deputy City Attorney, told Lee that he "possessed the full authority of the [Fremont City Manager]."  FAC ¶ 11.

Lee's allegations do not establish that Jagtap is a final policymaker.  It's true that city managers in many California cities are final policymakers under state law.  See Ellins v. Sierra Madre, 710 F.3d 1049, 1066 (9th Cir. 2013) (citing Cal. Gov. Code § 34851).  The same appears to be true in Fremont.  See FMC § 2.10.080(a) (the city manager has the power "[t]o see that all laws and ordinances of the city are duly enforced").  Yet Jagtap is a code enforcement officer, FAC ¶ 12, and she is not transformed into a final policymaker solely by a conclusory allegation that a deputy city attorney once said that the city manager delegated her power.

Even if Jagtap were a final policymaker, it would not matter because she never committed or ratified any constitutional tort.  See Rodriguez, 891 F.3d at 802–03.  While Jagtap signed the Notice and Orders to Abate Nuisance, see RJN, Ex. F at 45, Ex. H at 54, the Court has explained that Lee has not plausibly pleaded that this enforcement was discriminatory or retaliatory in nature.  Lee does not allege that Jagtap made any statement or act based on discriminatory animus or had intent to discriminate on the basis of religion, race, or national origin.  Nor does Lee allege

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

The Court therefore dismisses Claims 1-4 as insufficiently pleaded under <u>Monell</u>. Because the unreasonable searches claim (Claim 4) is untimely, amendment would be futile.  <u>See Leadsinger</u>, 512 F.3d at 532.  Further, in her two complaints, Lee has not produced a single concrete allegation that a City official commented on or took action because of her race or national origin; she includes only innuendo and vague allegations about her neighbor.  The Court therefore denies leave to amend Claim 2 as well.  The Court grants leave to amend only the religious discrimination and retaliation claims (Claims 1 and 3).

### B.    RLUIPA Claims (Claims 5-7)

Lee next asserts three claims under RLUIPA.  Lee argues that FMC section 18.55.110 violates RLUIPA, either facially (Claim 5), as applied when West told Lee that she could only pray in two structures (Claim 6), or as applied in the Amended Notice and Order to Abate (Claim 7).  But Plaintiffs repeatedly declare that they use the property only for <u>private</u> religious uses, so FMC section 18.55.110 does not apply to Plaintiffs' situation (if it ever did).  And although injury-in-fact might be implied because the provision is cited in five of thirteen violations in the Amended Notice, such injury is not redressable because each of those five violations is also based on countless other violations of state and city laws that are not subject to RLUIPA.  In other words, at this time, enjoining the City's enforcement of FMC section 18.55.110 would make no difference whatsoever to Plaintiffs.

### 1.    Legal Standard

To have standing for a claim, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190, 2203 (2021) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–561 (1992)).

As relevant here, RLUIPA applies when a "substantial burden is imposed in the

that Jagtap ratified anyone else's statements or actions.

implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(c).  Thus, RLUIPA is implicated "when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use."  Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter, 456 F.3d 978, 986 (9th Cir. 2006).  In such cases, RLUIPA "prohibits the government from imposing 'substantial burdens' on 'religious exercise' unless there exists a compelling governmental interest and the burden is the least restrictive means of satisfying the governmental interest."  Id. at 985–86 (quotation omitted).  This burden must rise above mere inconvenience.  Id. at 988-99.

Under RLUIPA, a "land use regulation" is a "zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land)." 42 U.S.C. § 2000cc-5(5).  Safety laws such as building or construction code provisions do not qualify as "land use regulations" under RLUIPA, at least where they do not explicitly reference zoning laws.  Anselmo v. Cty. Of Shasta, 873 F. Supp. 2d 1247, 1257 (E.D. Cal. 2012); see Salman v. City of Phoenix, 2015 WL 5043437, at *4 (D. Ariz. Aug. 27, 2015) (same as to "commercial or assembly construction code"); see also Second Baptist Church of Leechburg v. Gilpin Twp., 118 Fed. Appx. 615, 616 (3rd Cir. 2004) (same as to a city "sewer ordinance").

### 2.    FMC 18.55.110 (Claims 5 & 7)

In Claim 5, Lee facially challenges FMC section 18.55.110 and its associated table, arguing that it imposes a "substantial burden" on religious exercise by prohibiting "quasi-public uses" from land designated "Open Space/Hill (beyond Ridgeline)."  FAC ¶ 135.  In Claim 7, Lee challenges FMC section 18.55.110 and its associated table as applied in the March 2021 Amended Notice and Order to Abate Nuisance, which cites the provision (among many others) in five of the thirteen violations.  Id. ¶ 156.

The City makes strong arguments that, taking all facts as alleged by Plaintiffs, FMC

United States District Court
Northern District of California

section 18.55.110 poses no "substantial burden" on religious exercise because it does not single out religion and is justified by health, earthquake safety, and environmental concerns.  Mot. at 19-22.  However, the Court cannot reach the merits because Plaintiffs lack standing to challenge FMC section 18.55.110 under RLUIPA.  Their repeated factual statements make clear that (1) the plain terms of section 18.55.110 do not apply to Plaintiffs; or (2) to the extent it might injure them, the injury could not be redressed by a decision by this Court.  See TransUnion, 141 S. Ct. at 2203.

Chapter 18.55 of Fremont's Municipal Code establishes an "open space district" in the City.  See FMC Ch. 18.55; RJN Ex. A at 1.  The provision's express purpose is

> to permit limited but reasonable use of open lands while protecting the public health, safety and welfare from the dangers of seismic hazards and unstable soils; preserve the topography of the city that shapes it and give it its identity; allow land to be used for agricultural production in its natural or as near natural state as possible; coordinate with and carry out regional, county, and city open space plans; and where permitted, encourage clustering of dwelling units in order to preserve and enhance the remainder of open space lands as a limited and valuable resource.

FMC § 18.55.010; RJN Ex. A at 1.  To effectuate these purposes, the City's plan "identifies seven different open space land use designations to address a variety of open space opportunities and constraints."  Id.  Chapter 18.55 also sets forth building height standards, area, lot width, and yard standards, performance standards (which govern construction requirements for dwellings and other structures), land constraints, and other rules.  See FMC §§ 18.55.010–18.55.110; RJN Ex. A.

Section 18.55.110 contains a table that "establishes allowed uses within an open space zoning district."  FMC § 18.55.110; RJN Ex. A at 11.  The table lists numerous categories of land use, including "agricultural," "commercial and service," "recreation and open space," "residential," "public and quasi-public," and "other."  FMC § 18.55.110, tbl. 18.55.110; RJN Ex. A at 12–15.  The "public and quasi-public" category lists several specific uses, then includes a catch-all for more general public and quasi-public uses.  FMC § 18.55.110, tbl. 18.55.110; RJN Ex. A at 14.  The quasi-public use catch-all, in turn, includes "a use operated by a . . . religious . . . institution, with said use having the primary

purpose of serving the general public."  FMC § 18.25.3080; RJN Ex. B ¶ 2.  Such a use is

permitted, with a conditional use permit, in four of the open space plan's seven land use

designations.  But it is not permitted in three of the open space plan's land use

designations: (1) Hill (beyond Ridgeline); (2) Hill Face; and (3) Private.  See FMC

§ 18.55.110, Table 18.55.110; RJN Ex. A at 14.  The property at issue here is in the "Hill

(beyond Ridgeline)" are, so the code does not permit quasi-public uses.

Previously, in dismissing this facial challenge, the Court explained:

> Because this cause of action is based on the faulty premise that FMC
> section 18.55.110 excludes all religious uses from open space areas,
> it fails. The Court thus grants the City's motion to dismiss this
> claim. Lee may attempt to amend this claim, but must allege a
> substantial burden based on what FMC section 18.55.110 actually
> does, or how the City has implemented it.

Order at 24.  Plaintiffs persist in the same misunderstanding of FMC section 18.55.110.

Essentially the only difference is that, in addition to the facial challenge, they now also

include a conclusory claim that the City's implementation of section 18.55.110 violated

RLUIPA.

FMC section 18.55.110 has not caused Lee and the Temple an injury-in-fact that

would be redressable by this Court.  See TransUnion, 141 S. Ct. at 2203.  It's true that the

Amended Notice and Order to Abate cites to FMC 18.55.110 in the context of violations 1,

2, 4, 5, and 9.  See RJN, Ex. I.  Yet the decision on appeal of the Amended Notice and

Order does not mention FMC 18.55.110 and does not engage at all with the scope of Lee's

uses.  See RJN, Ex. J; e.g., id. at 1 ("Appellant has stated that she uses the Former Barn for

private religious purposes, a use that is not at issue in this proceeding."); id. at 12 n.4

("NOA 3, and the testimony of Ms. Jagtap reveal concern about the impermissible uses of

the property but do not actually charge the appellant with illegal use.").  Plaintiffs

repeatedly declare to this Court that their religious use is private, which indicates that FMC

18.55.110 does not apply to them.  See FAC ¶ 136 (alleging that FMC 18.55.110 deprives

Lee of the "private religious use" of her property).  In opposition, they again declare that

their use is wholly private.  See Opp'n at 23 ("[T]he religious usage Plaintiffs seek to use

the property is neither public or quasi public but, is instead, intended for private devotion."); id. at 25 ("[T]he exercise of [these free exercise] rights, in this specific context, would be private.").  They have made such declarations for years.  See RJN, Ex. J, at 2 ("In a letter dated November 11, 2019 (Exhibit 20), Appellant clarified that the proposed religious use was private.").  Therefore, on their own account, Plaintiffs' proposed use does not "hav[e] the primary purpose of serving the general public" and is no way prohibited by the zoning code.  FMC § 18.25.3080.

Plaintiffs erroneously insist, as they have previously, that FMC section 18.55.110 prohibits private religious uses because it does not explicitly discuss them.  See FAC ¶ 136; Opp'n at 25 (emphasizing that "no provision is made for strictly private religious usages").  But in dismissing their last complaint, the Court explained that Lee had "assume[d]" this interpretation of the provision "without support."  Order at 24 n.14.  The Court again finds that Plaintiffs' interpretation of FMC section 18.55.110 is unsupported by authority and defies common sense.

Further, even if the Court granted that Plaintiffs face a possible injury by "application of" of FMC section 18.55.110, it would not be redressable.  Each of the five violations in the Amended Notice and Order that cite section 18.55.110 also cite and describe dozens of other legal violations that independently require wide-ranging changes to (or demolitions of) the buildings.  Cf. RJN, Ex. J at 15 (hearing officer's decision noting the "extraordinary extent of Appellant's code violations").  Although these five violations mention section 18.55.110, they otherwise "appl[y]" other laws that are not "land use regulations" under RLUIPA.[12]  See Anselmo, 873 F. Supp. 2d at 1257.  The appeal of the

---

[12] Some courts have held that RLUIPA applies where the ends of zoning are pursued by means other than direct application of zoning laws, such as permitting and environmental quality statutes. See Fortress Bible Church v. Feiner, 694 F.3d 208, 217 (2d Cir. 2012) (holding that use of a state environmental law was an "application" of a zoning law under RLUIPA because it was used as a "vehicle for determining the zoning issues related to the Church's land use proposal"); United States v. Cty. of Culpeper, Virginia, 245 F. Supp. 3d 758, 768 (W.D. Va. 2017) (refusing to permit an "end-run around RLUIPA's expansive protections under the guise of environmental, safety, or building code regulations").  However, on the facts here, Plaintiffs have not plausibly alleged that these many construction and building code violations provide a "vehicle" for zoning.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Amended Notice and Order nowhere cites section 18.55.110.  Plaintiffs essentially

2   acknowledge this redressability problem but argue that, "in the event that the other

3   violations are remedied . . ., the violations grounded upon FMC Chapter 18.55.110 will

4   continue in effect, thus precluding use of the structures at issue."  FAC ¶ 157.  The Court

5   disagrees.  An injunction can make no difference to a plaintiff who is burdened in the same

6   way—to an equal or greater extent—by many other laws.

7       In sum, FMC section 18.55.110 cannot injure plaintiffs with no desire to pursue a

8   quasi-public use.  See TransUnion, 141 S. Ct. at 2203.  And even if Plaintiffs faced some

9   risk of enforcement, it would not be redressable by an injunction as to FMC section

10  18.55.110 because all other violations would still stand.  Although the Court does not see

11  how Plaintiffs can amend in light of judicially noticeable facts, the Court will nonetheless

12  permit to leave to amend Claims 5 and 7.  See Leadsinger, 512 F.3d at 532.

13                  **3.      West's Statement (Claim 6)**

14      In her sixth claim, Lee argues that the City violated RLUIPA when West

15  "instruct[ed] Plaintiff Lee that she could only pray on the property in the main house or in

16  the dome Meditation Hall and nowhere else on the Real Property."  FAC ¶ 147.  Lee

17  contends that this act was "an implementation of a land use regulation."  Id.  In its prior

18  order, this Court noted that Lee's allegations were "not entirely clear" but suggested that

19  Lee might reframe her earlier facial challenge in this way.  See Order at 25.

20      However, the Court now concludes that Lee does not state a claim on this basis

21  because Lee does not plausibly allege that this remark constituted the "application of [a

22  zoning or landmarking law" within the meaning of RLUIPA.  See 42 U.S.C. § 2000cc-5.

23  There are no allegations that West made this statement to apply FMC 18.55.110 to the

24  subject property.  There are no allegations that anyone from the City ever expressed the

25  view that FMC 18.55.110 prevented Lee from praying "[anywhere] else on the property."

26  None of the Notices and Orders to Abate gesture at this view.  Specific factual allegations

27  were necessary because the clear text of FMC § 18.55.110 and common sense indicate that

28  it in no way proscribes private religious uses.

1    None of Lee's allegations permit the inference that West's one statement allegedly

2    limiting her prayer on her property was an "application of" FMC section 18.55.110 or any

3    other zoning law.  The Court dismisses this claim with leave to amend.

4    **C.    California Claims (Claims 8 and 9)**

5    **1.    Contract Claim (Claim 8)**

6    Lee's eighth cause of action seeks a declaration that "the quasi-public or private

7    religious use of the [property] are [sic] permissible under the land conservation contract."

8    FAC ¶ 169.  The land conservation contract provides that the parties "desire to limit the

9    use of said property to agricultural and compatible uses in order to preserve a maximum

10   amount of agricultural land."  RJN ¶ 3; Ex. C at 1.  After the initial ten-year term, the

11   contract renews annually unless either party serves a notice of nonrenewal.  Mot. at 23; see

12   Cal. Gov. Code § 51243.  Lee has not served notice but may do so at any time.

13   The Court concludes that Lee lacks standing for a declaratory judgment or

14   injunctive relief on the land conservation contract.  The contract does not in any way cause

15   her "injury in fact that is concrete, particularized, and actual or imminent."  TransUnion,

16   141 S. Ct. at 2203.  The City's code enforcement action was not at all based on the

17   contract.  RJN Ex. I.  While prior notices to Lee referred to the contract, all alleged

18   violations were of state or city law.  See generally id.  Lee does not plausibly plead that the

19   City is likely to enforce the terms of the contract rather than the many other codes that

20   provided the basis for the thirteen violations in the Amended Notice and Order and the

21   hearing officer's final order.  See RJN Ex. I, Ex. J 12–14; see id. at 12 n.4 ("NOA4 notes

22   possible non-compliance with the Williamson Act contract binding the property but does

23   not charge Appellant with actual violation.").  The fact that Lee may end the contract at the

24   end of the annual term makes it even less likely that any hypothetical disagreement about

25   the contract will ever injure Lee.  Any dispute under the contract is not sufficiently

26   imminent to permit the Court to issue a declaration or injunction.  The Court dismisses the

27   contract claim and denies leave to amend as futile.

28

United States District Court
Northern District of California

2.      **Free Exercise (Claim 9)**

Lee argues that FMC section 18.55.110 violates the California Constitution's Free Exercise Clause.  FAC ¶¶ 174–77.  She again argues that the provision does not "permit the use of [property] zoned 'Open Space' / 'Hill Beyond the Ridgeline'" to be used for private religious purposes on her property.  FAC ¶¶ 182.  Lee requests an order declaring FMC section 18.55.110 "unenforceable and void" and an injunction preventing the City from enforcing it.  Id. ¶¶ 179–80.  The Court dismisses this claim because it again misunderstands FMC section 18.55.110.

The California Constitution provides (in relevant part) that "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed.  This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State."  Cal. Const. Art. I, § 4.

California's Free Exercise Clause bears some resemblance to the U.S. Constitution's Free Exercise Clause, which provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend I.  In Sherbert v. Verner, the U.S. Supreme Court held that a law that substantially infringes a person's religious exercise violates the First Amendment's Free Exercise Clause absent a compelling government interest.  374 U.S. 398, 406–07 (1963).  But later, in Employment Division, Oregon Department of Human Resources v. Smith, the U.S. Supreme Court held that the First Amendment's Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  494 U.S. 872, 879 (1990) (quotation omitted).

The California Supreme Court has repeatedly held that the U.S. Supreme Court's application of the First Amendment's Free Exercise Clause does not control application of California's Free Exercise Clause.  See, e.g., N. Coast Women's Care Med. Grp., Inc. v. Superior Court, 44 Cal. 4th 1145, 1158 (2008); Catholic Charities of Sacramento, Inc. v. Superior Court, 32 Cal. 4th 527, 560–62 (2004).  But the California Supreme Court has

also declined to "determine the appropriate test" for challenges under California's Free Exercise Clause.  N. Coast Women's Care Med. Grp., 44 Cal. 4th at 1158.  Indeed, the California Supreme Court has left open whether Sherbert, Smith, "or an as-yet unidentified rule that more precisely reflects the language and history of the California Constitution" applies to challenges under California's Free Exercise Clause.  Id. at 1159 (quoting Catholic Charities of Sacramento, 32 Cal. 4th at 562) (emphasis omitted).

Instead, the California Supreme Court has assumed without deciding that Sherbert's strict scrutiny test applies to such challenges.  See id.; Catholic Charities of Sacramento, 32 Cal. 4th at 562.  "Under that standard, a law could not be applied in a manner that substantially burdened a religious belief or practice unless the state showed that the law represented the least restrictive means of achieving a compelling interest or, in other words, was narrowly tailored."  Catholic Charities of Sacramento, 32 Cal. 4th at 562.  If a court determines that a challenged law passes muster under strict scrutiny, the court need not consider whether a less stringent standard should apply.  See id.

Here, Lee asserts that FMC section 18.55.110 violates California's Free Exercise Clause because her property cannot be used for quasi-public religious purposes.  FAC ¶ 174–75.  Yet, as discussed repeatedly above, Lee concedes that she does not use her property for quasi-public purposes.  See, e.g., Opp'n at 25 ("[T]he exercise of [these free exercise] rights, in this specific context, would be private.").  Lee again misunderstands the FMC and how it applies—or does not apply—to her property.[13]  The Court pointed out similar problems last time.  The Court will permit one more attempt to amend this claim.  If Lee does so, the Court suggests that Lee focus it not on FMC section 18.55.110, which does not burden her, but rather on how (specifically) the abatement order itself burdens her free exercise.

---

[13] Lee again argues that section 18.55.110 also implicates her privacy rights, such that her ninth claim is a "hybrid rights" claim.  Opp'n. at 25.  But the claim lacks allegations suggesting that the City's open space zoning plan could possibly burden Lee's privacy rights.  See San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1032 (9th Cir. 2004).

## IV.   CONCLUSION

For the foregoing reasons, the Court grants the City's motion to dismiss.  With respect to claims 2, 4, and 8, the Court denies leave to amend as futile.  With respect to claims 1, 3, 5, 6, 7, and 9, the Court gives leave to amend.  Lee may file an amended complaint within 21 days of the date of this order.

**IT IS SO ORDERED.**

Dated: March 4, 2022



CHARLES R. BREYER
United States District Judge