1

2

3

4

5  IN THE UNITED STATES DISTRICT COURT

6  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8  TEMPLE OF 1001 BUDDHAS, et al.,         Case No.  21-cv-04661-CRB

9          Plaintiffs,

10      v.                                  **ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND**

11  CITY OF FREMONT,

12          Defendant.

13      Defendant City of Fremont moves to dismiss Plaintiffs Miaolan Lee and Temple of

14  1001 Buddhas' second amended complaint.  For the third time, Plaintiffs allege that the

15  City violated their constitutional rights or otherwise burdened their religious practice when

16  it enforced thirteen violations of state and municipal laws against their property (including

17  but not limited to the California Building Code, Electrical Code, and Plumbing Code).

18  The Court has twice dismissed with leave to amend.  The City moves to dismiss for a third

19  time.  Finding oral argument unnecessary, the Court GRANTS the motion without leave to

20  amend.

21  **I.      BACKGROUND AND PROCEDURAL HISTORY**

22      **A.      Factual Background[1]**

23          **1.      The Property**

24      This lawsuit concerns property located at 6800 Mill Creek Road in Fremont,

25  California.  See SAC (dkt. 36) ¶ 15.  The property consists of 29 acres.  Id. ¶ 15.  It is

26

27  ───────────────

[1] In the complaint, Lee alleges hundreds of facts about the long saga of her dispute with the City.
28  Many of these facts are put forth in the Court's earlier orders in this case.  However, for the sake
of clarity, the Court omits those facts that lack an apparent relation to the claims in the second
amended complaint.

*United States District Court*
*Northern District of California*

situated on a hillside where the slope of the land is 15% or higher, in a very high fire hazard area, and an earthquake-induced landslide zone.  See RJN, Ex J (dkt. 38-10), at 2.[2] The property is zoned as "Open Space" and "Hill (beyond Ridgeline)" under city law.  Id. ¶ 31.  Among the purposes of the City's open space district is "to permit limited but reasonable use of open lands while protecting the public health, safety and welfare from the dangers of seismic hazards and unstable soils."  Fremont Municipal Code (FMC) § 18.55.010; RJN Ex. A at 1.

In 2010, Lee purchased the property, id. ¶ 16, which had undergone extensive unpermitted construction by prior owners, id. ¶ 22.  In the ensuing years, Lee initiated additional construction on the property.  In March 2018, Lee deeded ownership of the property to the Temple of 1001 Buddhas, a "private religious 501(c)(3) California corporation," but Lee has continued to live there and "uses it for private religious worship."  Id. ¶ 17.[3]  The property currently contains the following structures:

> 1) Hindu God House Structure (120-square-foot gazebo with pond) (id. ¶ 27(a));
>
> 2) A modular home with carport (a structure that existed when Lee acquired the property but that was later modified) (id. ¶ 27(b));
>
> 3) Meditation Hall (a remodeled version of the barn structure that existed when Lee acquired the property) (id. ¶ 27(c));
>
> 4) Main Buddha Hall (a remodeled version of a garage that existed when Lee acquired the property) (id. ¶ 27(d));
>
> 5) Green House (id. ¶ 27(e));

[2] The Court judicially notices the Final Notice and Order to Abate Nuisance issued by the City as to the property, as well as other relevant matters of public record, because they are "not subject to reasonable dispute."  See Fed. R. Evid. 201(b); RJN (dkt. 38); Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1002 (9th Cir. 2018).  However, the Court does not assume the truth of disputed facts in these documents.  See Khoja, 899 F.3d at 1002.  The Court does, however, find that the above facts, such as the location of the property on sloped land in a high fire hazard area, are not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).

[3] The complaint does not clearly allege Lee's connection to the Temple, but indicates that Lee has continued to live on the property.  The Court refers to Lee and the Temple collectively as "Lee."

United States District Court
Northern District of California

6) Retreat House (a new two-story accessory dwelling unit (ADU) built to house individuals attending religious retreats) (id. ¶ 27(f));

7) Solar panels (id. ¶ 27(g)).

8) Main Residence (a structure that existed when Lee acquired the property) (id. ¶ 27(h)); and

9) Tree House (id. ¶ 27(i)).

Lee alleges that her neighbors have also engaged in construction on their properties without required permits. Ron Sabraw, who is Caucasian, lives next door at 6900 Mill Creek Road. Id. ¶ 23, 122. Lee alleges that Sabraw once told Lee that it was very difficult to get permits for construction, so for decades everyone "just does what they have to do." Id. ¶ 23. He showed Lee the unpermitted improvements he had made to his own property, including "a detached [] garage, cottage and a deck supported by a steel I-beam, which was built approximately 75' from the seasonal creek bed" and that he uses Round-Up "extensively" on his property. Id. Lee alleges that another neighbor, Talley Polland, recently constructed "a 1/4 mile concrete driveway over and along the creek without permits." Id. ¶ 36. Mark Williamson, another resident of Mill Creek Road, has reported Sabraw's unpermitted structures for years. Id. ¶ 25.

### 2.    Early Interactions with the City

In 2014, Lee applied for and received permits from the City to finish improvement work on a dilapidated barn (which became the Meditation Hall). Id. ¶ 34. During the permitting process, the City's former building official observed religious statues Lee had installed on the property and allegedly said: "I wish the City did not know about them." Id. ¶ 35.[4]

In October 2017, City Code Enforcement Manager Leonard Powell sent Lee an email requesting access to the property. Id. ¶ 37. The next day, Powell and two other City

---

[4] Although it is not clear from the complaint which statues the building official had glimpsed, they may have been some of the "thirty-two [seven-foot] marble Arahats" that have been on the site since 2012. Id. ¶ 26.

United States District Court
Northern District of California

employees entered the property without permission and took pictures.  Id. ¶¶ 38–39.  In January, Powell emailed a formal request for an inspection, as the City had been made aware of the following violations: "(1) unpermitted construction of, on, or in multiple buildings; (2) extensive concrete work on the property; (3) construction or alteration of a natural watercourse; and (4) business operating in a residential zone."  Id. ¶ 45.

Later in January 2018, Lee met with Gary West, the City's Building Department Chief, and complained that City employees discriminated against her because of her religion and that one City employee falsely suggested on his business cards that he was a lawyer.  Id. ¶ 46.  West told Lee that he urgently needed to inspect the property.  Id.  City personnel then sought and obtained an inspection warrant from the Superior Court.  Id. ¶ 49.  On February 9, City employees, including West and Powell, searched the property, including Lee's bedroom and "most closets and drawers in the residence."  Id. ¶¶ 51, 52.

On March 28, 2018, Lee's attorney wrote to the City stating that Lee "remained ready to cooperate with any and all requests and inspections."  Id. ¶ 57.  The next day, the City issued a Notice and Order to Abate Nuisance listing numerous violations of the Fremont Municipal Code and ordering Lee to "immediately cease habitation and occupancy[]" of three structures: the main Buddha Hall, the Retreat House, and the Meditation Hall).  Id. ¶ 58.  The City stated that the three buildings lacked "adequate fire resistance-rated construction;" "adequate structural and foundation systems," "proper on site waste disposal and waste water treatment," and that there was a "substantial risk of partial or complete collapse" in an earthquake due to the lack of "appropriate mitigation measures" during construction.  Id. ¶ 59; see RJN Ex. F (dkt. 38-6).

In May 2018, Lee met with City staff "to attempt to resolve all concerns stated by the City."  Id. ¶ 64.  She agreed to allow City employees to inspect the property several days later.  But the City cancelled the appointment and instead obtained an inspection warrant from the Superior Court.  Id. ¶ 66.  City employees executed the warrant and inspected the property again.  Id. ¶¶ 67–68.  On June 8, at the City's request, Tanu Jagtap, a City Code Enforcement Officer, conducted a fourth inspection of Lee's property with her

own engineers and consultants present.  Id. ¶ 70.

### 3.    The Notices and Orders to Vacate

On June 13, 2018, Lee emailed a letter to the Mayor and City Council discussing her situation and arguing that the City had "misapprehended" her religious uses of the property, which were "private."  Id. ¶ 71.  The following day, the City sent Lee a Notice and Order to Vacate the ADU/Retreat House, the Main Buddha Hall/Garage, and the Meditation Hall/Former Barn.  Id. ¶ 72.  This Notice and Order, signed by West, stated that the buildings were "unlawful, unsafe[,] and unfit for human occupancy."  Id.  It required Lee to remove "all personal property" from them within two weeks.  Id.  According to Lee, two of these three structures were "pre-existing."  Id.  Lee refused to remove Buddha statues from the Main Buddha Hall, but she removed the meditation pillows and cushions. Id. ¶ 74.  Later that month, City employees requested and obtained entry to the property and posted notices barring entry on the three "condemned buildings" and at the main entrance.  Id. ¶ 75.  West visited the property and allegedly told Lee that she could only pray in the Meditation Hall or in her home.  Id. ¶ 80.  Since then, Lee has not been able to use these three buildings for their intended "meditation purposes to practice their faith." Id. ¶ 76.

Lee responded to the June 2018 Notice and Order in various ways.  For example, she sent the City notices of appeal, retained various structural engineers and consultants to perform work on the buildings, and updated the City as she attempted to bring the buildings into compliance with the City's instructions.  E.g., id. ¶¶ 77–78.  City employees had several meetings with Lee's consultants and representatives regarding plans for the property and permit applications.  Id. ¶¶ 79, 82–85.  But these steps did not solve the problem.  In May 2019, the City recorded a Notice of Substandard Building/Structure with the County Recorder's Office of the County of Alameda, indicating that the Retreat House, the Main Buddha Hall, and the Meditation Hall were "unsafe, dangerous and a public

United States District Court
Northern District of California

nuisance." Id. ¶ 86.[5]

Meanwhile, nearby resident Mark Williamson had been complaining to the City about neighboring properties. In May 2018, he made a "report of concerns" concerning discrimination and bias as to enforcement and investigation of permitting requirements. Id. ¶ 62. In August 2019, he made another report of concerns about Sabraw's and Polland's properties, in a complaint entitled "inconsistent enforcement of zoning issues on and around Mill Creek Road in Fremont." Id. ¶ 90. In June and again in November 2019, Lee complained to the City about these properties and alleged discriminatory code enforcement. Id. ¶¶ 88, 99. In December 2019, the City assigned someone to investigate Polland's property, but the complaint was closed as unfounded. Id. ¶ 100.

On October 7, 2019, Lee applied for conditional use permits. Id. ¶ 95. Shortly thereafter, some City employees made inartful statements suggesting that Lee was using religious rhetoric to obscure the problems with the property. At a December meeting, Wayne Morris, the City's Deputy Community Director, "accused [Lee] of fabricating her religious beliefs for permit purposes" and asked Lee whether she thought "Buddha is ok with the construction." Id. ¶ 101. Lee alleges that Morris said that she was "using the Buddha as a protective shield." Id. Morris then told Lee that the permit process was "going to be so expensive" that the buildings "need to come out." Id.

In January 2020, Morris, Powell, and James Willis (another city employee) inspected the property again. Id. ¶ 105. Lee repeated to Willis that her neighbor Sabraw had also performed unpermitted work on his property and that the City's application of its laws were "inconsisten[t]." Id. ¶ 106. In February, Lee complained to the City that it should hold her citations in abeyance while her conditional use permits were pending, as she claimed the City had done for other properties. Id. ¶ 109. The following month, the City withdrew some of the citations. Id. ¶ 110. In October, Lee submitted a modified application for permits. Id. ¶ 115. Willis told Lee her application was incomplete. Id.

---

[5] Lee also alleges that someone at the City asked the San Francisco Bay Regional Water Control Board to investigate compliance on Lee's property (but not on neighboring properties). Id. ¶ 81.

¶ 116.

On March 11, 2021, the City issued a 58-page Amended Notice and Order to Abate Nuisance, which required the demolition of three buildings on the property.  See id. ¶¶ 120, 122–26.  The Amended Order documented thirteen violations of the City's zoning laws and permitting rules, as well as of California's Building Code, Electrical Code, Plumbing Code, Mechanical Code, Fire Code, Fish and Game Code, and Environmental Quality Act.  See, e.g., RJN Ex. J at 7, 10–11, 13–14, 17, 23–24, 26–27, 32–33, 38, 46–50, 52.  Lee was "shocked" because she had reported the three structures to the County Assessor's Office in 2018 and paid the relevant taxes associated with them.  SAC ¶ 121. Lee alleges that, "upon information and belief," Sabraw's deck is "in similar proximity to a watercourse" and thus violations 1 and 2 (of 13) could also apply to that property.  Id. ¶¶ 122-23.

After several attempts to discuss her situation with Fremont's Mayor and members of the City Council, Lee held a press conference denouncing the "systemic religious and race discrimination she was facing from [the] City" on May 11, 2021.  Id. ¶¶ 127–37.

## B. Procedural History

In June 2021, the Temple and Lee filed the instant lawsuit, asserting a dozen federal and state causes of action.  See Compl. (dkt. 1).  The Court granted the City's motion to dismiss with leave to amend.  See First Dismissal Order (dkt. 25).

The Temple and Lee filed an amended complaint asserting nine federal and state causes of action.  See FAC.  The Temple and Lee asserted two 42 U.S.C. § 1983 claims based on religious discrimination and retaliation, three claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), one claim concerning the validity of a land conservation contract, and one claim under the California Constitution's Free Exercise Clause.  Lee individually asserted additional Section 1983 claims for discrimination based on race, discrimination based on national origin, and unreasonable searches.  Id.  The Court again granted the motion to dismiss.  Second Dismissal Order (dkt. 34).  It granted leave to amend six of the claims, but denied leave as futile as to the

7

1   Section 1983 claims for racial discrimination and unreasonable searches, as well as the

2   land conservation contract claim.  Id. at 30.

3        Plaintiffs' second amended complaint asserts seven claims: three Section 1983

4   claims for religious discrimination, retaliation, and substantive due process/equal

5   protection; a RLUIPA claim; and three claims under the Right to Liberty, Free Exercise

6   Clause, and Substantive Due Process in the California Constitution.  SAC (dkt. 36) at 47–

7   67.  Three of these seven claims were not raised in any prior complaint.  The City moves to

8   dismiss.  Mot. (dkt. 37).

9        Meanwhile, Lee has appealed the Amended Notice and Order in state court.  In

10  August 2021, after five days of hearings, the hearing officer issued a memorandum of

11  decision upholding nearly all of the violations the City found.  Id. ¶ 139; RJN Ex. K.  In

12  November 2021, Lee timely filed a petition for writ of mandate to the Alameda County

13  Superior Court.  Id. ¶ 139.

14  **II.    GENERAL LEGAL STANDARD**

15       Under Federal Rule of Civil Procedure 12(f), a court may "strike from a pleading . .

16  . any redundant [or] immaterial . . . matter."  Fed. R. Civ. P. 12(f).  The rule is designed to

17  "avoid the expenditure of time and money that must arise from litigating spurious issues by

18  dispensing with those issues prior to trial."  Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d

19  970, 973 (9th Cir. 2010) (quotation and citation omitted).  Where a plaintiff raises new

20  claims in an amended complaint after the court granted leave to amend without limitation,

21  California district courts often consider the new claims.  E.g., Topadzhikyan v. Glendale

22  Police Dept., 2010 WL 2740163, at *3 n. 1 (C.D. Cal. July 8, 2010).  But "where leave to

23  amend is given to cure deficiencies in certain specified claims, courts have agreed that new

24  claims alleged for the first time in the amended pleading should be dismissed or stricken."

25  DeLeon v. Wells Fargo Bank, N.A., 2010 WL 4285006, at *3 (N.D. Cal. Oct. 22, 2010)

26  (citing cases); see, e.g., PB Farradyne, Inc. v. Peterson, 2006 WL 2578273, at *3 (N.D.

27  Cal. Sept. 6, 2006) (striking a claim because it was "outside the scope of the leave to

28  amend" previously granted); see also Sapiro v. Encompass Ins., 221 F.R.D. 513, 516-17

United States District Court
Northern District of California

United States District Court
Northern District of California

(N.D. Cal. 2004) (noting that Rule 12(f) motions can be granted "when necessary to discourage parties from filing 'dilatory' pleadings and papers").

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint may be dismissed for failure to state a claim for which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  Rule 12(b)(6) applies when a complaint lacks either a "cognizable legal theory" or "sufficient facts alleged" under such a theory.  Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1208 (9th Cir. 2019).  Whether a complaint contains sufficient factual allegations depends on whether it pleads enough facts to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.  When evaluating a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  The Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A court has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."  Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

**III.   DISCUSSION**

The Court grants the motion to dismiss.  First, the Court dismisses the three claims

Lee raises for the first time, as the Court's previous order limited leave to amend.  Second, the Court dismisses Lee's two remaining Section 1983 claims because Lee has not plausibly alleged that the City committed religious discrimination or retaliation.  Third, the Court dismisses Lee's RLUIPA claim because the City's land use ordinance does not in any way disallow her current or proposed uses of the property.  Finally, Lee's California free exercise claim fails because it is once again insufficiently pleaded.

### A.    Motion to Strike (Claims 3, 5, and 7)

Lee raises three claims for the first time: a Section 1983 claim for violation of the due process clause and equal protection clause (Claim 3) and claims for declaratory relief under two provisions of the California Constitution: right to liberty and substantive due process (Claims 5, 7).  SAC ¶¶ 167–81, 193–97, 205–11.

The Court strikes these three claims under Rule 12(f) to "avoid . . . litigating spurious issues."  See Whittlestone, 618 F.3d at 973.  "[W]here leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken."  DeLeon, 2010 WL 4285006, at *3.  The Court permitted Lee to amend her initial complaint without limitation.  See First Dismissal Order.  Despite this, Lee neglected to include new claims in her amended complaint.  See FAC.  In its second dismissal order, the Court again described the specific deficiencies in her reasserted claims, but certain claims were dismissed without leave to amend because amendment would be futile.  See Order Dismissing FAC at 30.  It permitted amendment only as to claims that could plausibly be amended by the inclusion of additional facts.  Id.  Lee admits that Claims 3, 5, and 7 are beyond the scope of the Court's previous order.  Opp. at 7.  The Court strikes these claims. See DeLeon, 2010 WL 4285006, at *3.

### B.    Section 1983 Claims (Claims 1 and 2)

Lee raises two claims against the City under 42 U.S.C. § 1983: discrimination on the basis of religion and retaliation for opposition to discrimination.  SAC ¶¶ 144–56, 157–66.  As in Lee's prior two complaints, these claims fail because Lee has not alleged

1  constitutional harm caused by a municipal policy or final policymaker.  See Monell v.

2  Dept. of Soc. Servs. of City of New York, 436 U.S. 658 (1978).

3         Under 42 U.S.C. § 1983, any person who, "under color of" state law, subjects any

4  person "to the deprivation of any rights, privileges, or immunities secured by the

5  Constitution and laws, shall be liable to the party injured in an action at law."

6  "[M]unicipalities and other local government units" are "included among those persons to

7  whom § 1983 applies."  Monell, 436 U.S. at 690.  That said, "Congress did not intend

8  municipalities to be held liable unless action pursuant to official municipal policy of some

9  nature caused a constitutional tort."  Id. at 691.

10        A plaintiff may maintain a cause of action against a municipality only when "the

11  action that is alleged to be unconstitutional implements or executes a policy statement,

12  ordinance, regulation, or decision officially adopted and promulgated by that body's

13  officers," or implements or executes a less formal "governmental custom."  Id. at 690–91

14  (quotation omitted).  Although the relevant policy or custom itself need not be

15  unconstitutional, there must be "a direct causal link between a municipal policy or custom

16  and the alleged constitutional deprivation."  City of Canton, Ohio v. Harris, 489 U.S. 378,

17  385, 387 (1989).  And the policy or custom must be "the moving force behind the

18  constitutional violation."  Id. at 388 (alteration and quotation omitted).  In short, Monell

19  requires that the constitutional injury results from "[1] an expressly adopted official policy,

20  [2] a long-standing practice or custom, or [3] the decision of a final policymaker."  Ellins

21  v. City of Sierra Madre, 710 F.3d 1049, 1066 (9th Cir. 2013) (quotations omitted).

22        Under the final policymaker theory, a City is only liable for the constitutional torts

23  of an official with "final policymaking authority [for the City] . . . in a particular area, or

24  on a particular issue."  McMillian v. Monroe County, 520 U.S. 781, 785 (1997).  The

25  policymaker must either commit the constitutional tort or ratify "a subordinate's

26  unconstitutional decision or action and the basis for it."  Rodriguez v. Cty. of Los Angeles,

27  891 F.3d 776, 802–03 (9th Cir. 2018) (quoting Gravelet-Blondin v. Shelton, 728 F.3d

28  1086, 1097 (9th Cir. 2013)).  Ratification requires a "deliberate choice to endorse" a

1    subordinate's action.  Gillette v. Delmore, 979 F.2d 1342, 1347 (9th Cir. 1992), overruled

2    on other grounds (quotation and citation omitted).

3           The Court finds it implausible that the City had a policy or custom that led to a

4    constitutional violation.  See Order Dismissing FAC at 13–14.  Although Plaintiffs claim

5    that the City has a longstanding custom "against allowing religious practice on private

6    properties zoned 'Open Space' and 'Hill (beyond Ridgeline),'" SAC ¶¶ 150, they provide

7    no allegation that such a custom ever existed.  Their sole legal citation is to an inapposite

8    case involving a police department policy.  See Opp. at 12 (citing Solis v. City of Vallejo,

9    2014 WL 2768847, at *6 (E.D. Cal. June 18, 2014)).

10          However, the Court finds it plausible that West could have been a "final

11   policymaker" for his acts "overseeing local code enforcement activities" as the City's

12   building official.  Cal. Health & Safety Code § 18949.27; see Order Dismissing FAC at 14

13   (concluding the same).  Nonetheless, the Section 1983 claims fail because West did not

14   commit (or ratify) any instance of religious discrimination or retaliation while overseeing

15   local code enforcement.

16                     **1.      Religious Discrimination**

17          In their first Section 1983 claim, Plaintiffs allege that the City is liable because

18   West "committed, ratified in approving, and/or acted with deliberate indifference to his

19   subordinates' actions . . . in furtherance of religious bias."  SAC ¶ 151.  In paragraph 152,

20   Plaintiffs include a several-page laundry list of thirty-five alleged facts (subsection a

21   through z, then aa through ii) that they claim show religious bias.  Id. ¶ 152.

22          A state actor violates the Free Exercise Clause of the First Amendment when it

23   "substantially burdens the person's practice of their religion."  Jones v. Williams, 791 F.3d

24   1023, 1031 (9th Cir. 2015).  This standard requires "more than an inconvenience on

25   religious exercise; it must have a tendency to coerce individuals into acting contrary to

26   their religious beliefs or exert substantial pressure on an adherent to modify his behavior

27   and to violate his beliefs."  Id. (cleaned up).  The Supreme Court has also recently

28   explained that a regulation violates the Free Exercise Clause when it "single[s] out houses

United States District Court
Northern District of California

United States District Court
Northern District of California

of worship for especially harsh treatment" vis-à-vis similarly situated secular establishments.  See Roman Cath. Diocese of Brooklyn v. Cuomo, 141 S. Ct. 63, 66 (2020) (per curiam).

Plaintiffs allege no plausible religious bias in West's decisions as building officer. As in Plaintiffs' previous complaints, virtually none of the allegations as to West relate to Plaintiffs' religion.  The most problematic allegations have little or nothing to do with West or his role.  E.g., id. ¶ 152(ee) ("City staff mocked Plaintiffs' religious beliefs and repeatedly accused her of lying about her Buddhist faith.").  Plaintiffs do not allege that West was present when any of these comments were made, e.g., id. ¶ 101, or even that he was aware of them.  Certainly they do not allege that he made a "deliberate choice to endorse" them.  See Gillette, 979 F.2d at 1347.  And although Lee's newest complaint includes more allegations that the City has not enforced the law as to alleged unpermitted construction by two of her neighbors (Sabraw and Polland), Lee still has not alleged that either neighbor is similarly situated with legal and code violations as serious or extensive as those on the Temple's property.  Thus, Plaintiffs have not pleaded that the City singled Plaintiffs out "for especially harsh treatment" compared to secular people who are similarly situated.  See Roman Cath. Diocese, 141 S. Ct. at 66.

Nor can the Court credit Plaintiffs' allegation that "[t]he City [i.e., West] ordered Plaintiff to pray only in one place on her property and to remove religious materials from Plaintiffs' religious buildings."  SAC ¶ 152(u); id. ¶ 80.  The latter part of the comment (to remove religious materials from the condemned buildings) does not show religious bias because it appears that he was encouraging her to protect her religious materials.  See id. ¶ 72 (noting that the Notice and Order to Vacate also required removing personal property from the buildings).  And the Court finds highly implausible that West "ordered" Lee to pray in only one place on her 29-acre property.  But even assuming that he did, this errant comment was not within the scope of West's authority to interpret the building code, and it bears no connection to any of the City's other official acts, such as its Notices and Orders to Abate or the Notice and Order to Vacate.  It is not plausibly a constitutional violation

that may be attributed to the City.

The other allegations, to the extent that they relate to code enforcement, have nothing to do with religion.  See, e.g., id. ¶ 152(m) ("The City falsely alleged evidence to support the specific violations in NOA 2, NOA 2A, NOA 3, and the NOV."); id. ¶ 152(ii) ("The City ignored the fact that there were existing, unpermitted structures at the property for years, including in the same footprints that Plaintiffs' improvements were made, before Plaintiffs took ownership of the property.").  The property is on a hillside with a slope of 15% or higher, in a very high fire hazard area, and an earthquake-induced landslide zone.  See RJN, Ex J, at 2.  There appears to be an extensive evidentiary record in support of the City's enforcement.  See, e.g., RJN, Ex G, H, I, J, K.  Of course, for the purposes of this motion, the Court does not assume the truth of the City's findings.  The City's evidence of Lee's violations may be erroneous, and the state court may well reach this conclusion.  Yet even if West's enforcement action was based on flawed facts, Lee is far from plausibly suggesting that the errors were caused by religious bias.

In essence, Plaintiffs urge the Court to assume (without concrete factual allegations) that West acted with religious bias.  Their main allegations are: (1) West investigated and enforced many legal violations on Lee's property pertaining to three buildings she uses for religious purposes; and (2) two of Lee's neighbors have at least one instance of unpermitted construction on their property, apparently for secular use, but West has not enforced the law against them.  This is not sufficient to show religious bias.

Plaintiffs are not "substantially burdened" by the City's application of state and city environmental and safety laws that disallow them from practicing their religion in the three buildings they would like to use.  See Rodriguez, 891 F.3d at 802–03.  Although the code enforcement does not permit her to use those three buildings, Lee can exercise her religion elsewhere on her property.  The code enforcement does not "coerce [her] into acting contrary to [her] religious beliefs or exert substantial pressure on [her] to modify his behavior and to violate [her] beliefs."  Jones, 791 F.3d at 1031.

United States District Court
Northern District of California

### 2.      Retaliation

Plaintiffs' second Section 1983 claim, that the City retaliated against her for her opposition to discrimination, also fails.  See SAC ¶ 157-66.  A First Amendment claim for retaliation requires a "substantial causal relationship" between a plaintiff's "constitutionally protected activity" and "adverse [government] action . . . that would chill a person of ordinary firmness from continuing to engage in the protected activity."  Blair v. Bethel Sch. Dist., 608 F.3d 540, 543 (9th Cir. 2010).

Plaintiffs list nine instances of speech or activity they allege was protected by the First Amendment: complaints about her neighbors, complaints about inspections, and accusations that the City engaged in racial and religious discrimination.  SAC ¶ 160(a)-(i).  They then list six instances of alleged retaliation involving the stages of the investigation and enforcement of city and state laws.  Id. ¶ 161(a)-(f).  They allege that West "committed retaliation, ratified in approving his subordinates' retaliatory actions, and/or acted with deliberate indifference to his subordinates' retaliatory actions."  Id. ¶ 162.  Plaintiffs then list thirteen purported examples of that retaliation.  See id. ¶ 162(a)-(m).

These allegations of retaliation fail to state a claim for largely the same reasons discussed in the Court's prior order.  See Order Dismissing FAC at 18-19 & n.10.  In fact, Plaintiffs mostly discuss the same two instances of retaliation that the Court already rejected.  First, they insist that West issued the first inspection warrant "for retaliatory reasons."  SAC ¶ 162(b); Opp. at 14.  This is not plausible.  West indicated that he needed to inspect her property at the same meeting that Lee complained that she was being discriminated against.  SAC ¶ 46.  There is no "substantial causal relationship" between two contemporaneous views of the same investigation that had been pending for months.  See Blair, 608 F.3d at 543.  Plaintiffs themselves allege that the City had already informed them of violations on the property on January 12, 2018—weeks before Plaintiffs ever complained to West about discrimination.  See SAC ¶ 45.

Second, Plaintiffs claim that West retaliated for their complaints of discrimination to the Mayor and City Council on June 13, 2018 by issuing the Notice and Order to Vacate

United States District Court
Northern District of California

the following day.  SAC ¶ 162(e); Opp. at 13-14.  But Plaintiffs also admit that West

lacked personal knowledge of Lee's letter.  Opp. at 13.  The Court has already stated that

Plaintiffs need "significantly more to connect West's enforcement action to Lee's

protected activity."  Order Dismissing FAC at 19.  Yet still, Plaintiffs allege only that (1)

they complained to some people at the City about an ongoing enforcement proceeding; and

(2) another other part of government continued that enforcement proceeding.  That does

not plausibly allege that West took "adverse action" with a sufficiently "substantial causal

relationship" to protected activity—it merely alleges that the investigation continued.  See

Blair, 608 F.3d at 543.  Temporal proximity between two events with "little else" does not

support a retaliation claim.  See Pratt v. Rowland, 65 F.3d 802, 808 (9th Cir. 1995).

In sum, although West may be a final policymaker under Monell with respect to

enforcement and interpretation of the building code, Lee has failed to plead that he

discriminated on the basis of religion or retaliated for protected activity.  See Rodriguez,

891 F.3d at 802–03.  Nor has Lee pleaded that West ratified constitutional injury

perpetrated by one of his subordinates.

As the Court has twice dismissed these two claims on the same grounds, the Court

concludes that amendment is futile and dismisses them without leave to amend.[6]

### C.  RLUIPA Claim (Claim 4)

Next, Lee argues that FMC section 18.55.110 facially violates RLUIPA because

disallowing quasi-public religious uses in the "Open Space/Hill (beyond Ridgeline)" area

is a "substantial burden" on Plaintiffs' religious practice.  SAC ¶¶ 182-92.  The Court

dismisses this claim for lack of standing.

To have standing for a claim, a plaintiff must show "(i) that he suffered an injury in

fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely

---

[6] Plaintiffs insist that they should "be permitted discovery as to the discrimination claim" because
it is difficult to precisely allege discrimination at the motion-to-dismiss stage.  See Opp. at 15-17.
But the Supreme Court has made clear that the standard for passing a motion to dismiss is whether
the "the plaintiff pleads factual content that allows the court to draw the reasonable inference that
the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).
After three increasingly prolix complaints, Plaintiffs have not done so.

caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992)).

As relevant here, RLUIPA applies when a "substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(c). Thus, RLUIPA is implicated "when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use." Guru Nanak Sikh Soc. of Yuba City v. Cnty. of Sutter, 456 F.3d 978, 986 (9th Cir. 2006). In such cases, RLUIPA "prohibits the government from imposing 'substantial burdens' on 'religious exercise' unless there exists a compelling governmental interest and the burden is the least restrictive means of satisfying the governmental interest." Id. at 985–86 (quotation omitted).

Under RLUIPA, a "land use regulation" is a "zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land)." 42 U.S.C. § 2000cc-5(5). Safety laws such as building or construction code provisions do not qualify as "land use regulations" under RLUIPA, at least where they do not explicitly reference zoning laws. Anselmo v. Cty. Of Shasta, 873 F. Supp. 2d 1247, 1257 (E.D. Cal. 2012); see Salman v. City of Phoenix, 2015 WL 5043437, at *4 (D. Ariz. Aug. 27, 2015) (same as to "commercial or assembly construction code"); see also Second Baptist Church of Leechburg v. Gilpin Twp., 118 Fed. Appx. 615, 616 (3rd Cir. 2004) (same as to a city "sewer ordinance").

Chapter 18.55 of Fremont's Municipal Code establishes an "open space district" in the City. See FMC Ch. 18.55; RJN Ex. A at 1. The provision's express purpose is

> to permit limited but reasonable use of open lands while protecting the public health, safety and welfare from the dangers of seismic hazards and unstable soils; preserve the topography of the city that shapes it and give it its identity; allow land to be used for agricultural production in its natural or as near natural state as possible; coordinate with and carry out regional,

county, and city open space plans; and where permitted, encourage clustering of dwelling units in order to preserve and enhance the remainder of open space lands as a limited and valuable resource.

FMC § 18.55.010; RJN Ex. A at 1. To effectuate these purposes, the City's plan "identifies seven different open space land use designations to address a variety of open space opportunities and constraints." Id. Chapter 18.55 also sets forth building height standards, area, lot width, and yard standards, performance standards (which govern construction requirements for dwellings and other structures), land constraints, and other rules. See FMC §§ 18.55.010–18.55.110; RJN Ex. A.

Section 18.55.110 contains a table that "establishes allowed uses within an open space zoning district." FMC § 18.55.110; RJN Ex. A at 11. The table lists numerous categories of land use, including "agricultural," "commercial and service," "recreation and open space," "residential," "public and quasi-public," and "other." FMC § 18.55.110, tbl. 18.55.110; RJN Ex. A at 12–15. The "public and quasi-public" category lists several specific uses, then includes a catch-all for more general public and quasi-public uses. FMC § 18.55.110, tbl. 18.55.110; RJN Ex. A at 14. The quasi-public use catch-all, in turn, includes "a use operated by a . . . religious . . . institution, with said use having the primary purpose of serving the general public." FMC § 18.25.3080; RJN Ex. B ¶ 2. Such a use is not permitted in three of the open space plan's land use designations: (1) Hill (beyond Ridgeline); (2) Hill Face; and (3) Private. See FMC § 18.55.110, tbl. 18.55.110; RJN Ex. A at 14. Plaintiffs' property is in the "Hill (beyond Ridgeline)" area, where the code does not permit quasi-public uses.

In their previous two complaints, and in earlier statements to the City, Plaintiffs represented that they use the property only for "private" purposes. See, e.g., FAC ¶ 136; Opp. to MTD FAC (dkt. 31) at 23 (stating that the uses are "intended for private devotion"); id. at 25 (similar); RJN, Ex. K at 2 ("In a letter dated November 11, 2019 (Exhibit 20), Appellant clarified that the proposed religious use was private."). Thus, in its last order, the Court held that Plaintiffs lacked standing because (1) FMC section 18.55.110 did not apply to them and did not injure them; and (2) even if they suffered

injury, a favorable decision could not redress it in light of the many other laws they had violated.  <u>See</u> Order Dismissing FAC at 24-26.

Though Plaintiffs still allege that they use the property for "private religious worship," SAC ¶ 17, they argue that they have standing because they might (some day) pursue a quasi-public use, <u>see</u> <u>id.</u> ¶¶ 184, 188; Opp. at 24.  Yet the Plaintiffs never present any detail about any proposed use that "ha[s] the primary purpose of serving the general public," FMC § 18.25.3080, and never allege any intention to pursue any such use soon, <u>see, e.g.</u>, Opp. at 24 n.5 (explaining that Plaintiffs are challenging the ordinance because "they are prohibited from using the real property for quasi-public usages [sic] should they ever so desire").  Federal jurisdiction depends on their bare allegation that, at some point in the future, they might do something different with the property.

Plaintiffs therefore lack standing to challenge FMC section 18.55.110 for the same reasons explained in its prior order.  The ordinance does not currently injure the Plaintiffs.  <u>See</u> Order Dismissing FAC at 24-26.  And the allegation that Plaintiffs may some day "desire" to open the property to quasi-public uses does not remedy this jurisdictional deficiency because it does not establish "concrete, particularized, and actual or imminent" injury.  <u>See</u> <u>TransUnion</u>, 141 S. Ct. at 2203.  It also remains true that, even if that injury were cognizable, it could not be redressed by a favorable decision because of the "dozens of other legal violations that independently require wide-ranging changes to (or demolitions of) the buildings."  Order Dismissing FAC at 25.  As the Court already once permitted Plaintiffs to fix this exact deficiency, the Court dismisses this claim with prejudice.  <u>See</u> <u>Leadsinger</u>, 512 F.3d at 532.

### D.      California Claim (Claim 6)

In their sixth claim, Plaintiffs seek a declaration that the City's enforcement of its building codes violates the California Constitution's Free Exercise Clause.  <u>See</u> SAC ¶¶ 198–204.  Plaintiffs argue that the City "initiated and maintained criminal investigations, code enforcement, and abatement proceedings based upon religious animus against the religious beliefs of the Plaintiffs."  <u>Id.</u> ¶ 200; <u>see</u> <u>id.</u> ¶ 200(a)-(f) (detailing

United States District Court
Northern District of California

examples alleged earlier in the complaint).  Plaintiffs again fail to state this claim.

The California Constitution provides (in relevant part) that "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed.  This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State."  Cal. Const. Art. I, § 4.

California's Free Exercise Clause bears some resemblance to the U.S. Constitution's Free Exercise Clause, which provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend I.  In Sherbert v. Verner, the U.S. Supreme Court held that a law that substantially infringes a person's religious exercise violates the First Amendment's Free Exercise Clause absent a compelling government interest.  374 U.S. 398, 406–07 (1963).  But later, in Employment Division, Oregon Department of Human Resources v. Smith, the U.S. Supreme Court held that the First Amendment's Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  494 U.S. 872, 879 (1990) (quotation omitted).

The California Supreme Court has repeatedly held that the U.S. Supreme Court's application of the First Amendment's Free Exercise Clause does not control application of California's Free Exercise Clause.  See, e.g., N. Coast Women's Care Med. Grp., Inc. v. Superior Court, 44 Cal. 4th 1145, 1158 (2008); Catholic Charities of Sacramento, Inc. v. Superior Court, 32 Cal. 4th 527, 560–62 (2004).  But the California Supreme Court has also declined to "determine the appropriate test" for challenges under California's Free Exercise Clause.  N. Coast Women's Care Med. Grp., 44 Cal. 4th at 1158.  Indeed, the California Supreme Court has left open whether Sherbert, Smith, "or an as-yet unidentified rule that more precisely reflects the language and history of the California Constitution" applies to challenges under California's Free Exercise Clause.  Id. at 1159 (quoting Catholic Charities of Sacramento, 32 Cal. 4th at 562 (emphasis omitted).

Instead, the California Supreme Court has assumed without deciding that Sherbert's

20

strict scrutiny test applies to such challenges.  See id.; Catholic Charities of Sacramento, 32 Cal. 4th at 562.  "Under that standard, a law could not be applied in a manner that substantially burdened a religious belief or practice unless the state showed that the law represented the least restrictive means of achieving a compelling interest or, in other words, was narrowly tailored."  Catholic Charities of Sacramento, 32 Cal. 4th at 562.  If a court determines that a challenged law passes muster under strict scrutiny, the court need not consider whether a less stringent standard should apply.  See id.

Even under strict scrutiny, the California free exercise claim fails because Plaintiffs do not plausibly allege that the City's decisions substantially burdened their religious practice.  In their opposition, Plaintiffs inaccurately argue that the City is preventing Plaintiffs from exercising their religion on the property.  See, e.g., Opp. at 26 ("Plaintiffs allege that the City has directly interfered with their right to free exercise of their religion by prohibiting religious use of Plaintiffs' property." (citing SAC ¶¶ 200-202)).  This is not true.  Although the enforcement does not permit Plaintiffs to use the three buildings that are (purportedly) in noncompliance with the law, Plaintiffs can exercise their religion elsewhere on the 29-acre property and in any buildings other than the three mentioned in the Notice and Order to Vacate.  Plaintiffs use the property "for private religious worship," SAC ¶ 17, and while they may be inconvenienced in having to do so in different buildings, they do not allege facts suggesting that this burden is "substantial" such that strict scrutiny would be triggered.  See Catholic Charities of Sacramento, 32 Cal. 4th at 562.  Without much more, code enforcements that preclude worship in a specific building for environmental or safety reasons do not violate the right to free exercise.  Because the City's enforcement passes muster under strict scrutiny, the Court need not go further.

In analyzing the previous complaint, the Court stated it would permit only one more chance to amend this claim.  Accordingly, the Court denies leave to amend.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the City's motion to dismiss without leave to amend.  See Leadsinger, 512 F.3d at 532.

**IT IS SO ORDERED.**

Dated:  May 18, 2022



CHARLES R. BREYER
United States District Judge